UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL FRANCIS WELSH,

        Petitioner,

v.                                             CASE NO. 2:06-15295
                                             HONORABLE DENISE PAGE HOOD

BLAINE LAFLER,

        Respondent.
_____/

**<u>OPINION AND ORDER DENYING HABEAS CORPUS PETITION,
BUT GRANTING A CERTIFICATE OF APPEALABILITY
AND LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL</u>**

Petitioner Michael Francis Welsh has filed a *pro se* habeas corpus petition under 28 U.S.C. § 2254. The habeas petition challenges Petitioner's state convictions for criminal sexual conduct and furnishing alcohol to a minor. Respondent Blaine Lafler urges the Court through counsel to deny the petition. The Court has concluded that Petitioner's claims lack merit. Accordingly, the habeas petition will be denied.

**I. Background**

    **A. The Charges and Trial Testimony**

Petitioner was charged in Van Buren County, Michigan with two counts of third-degree criminal sexual conduct, Mich. Comp. Laws § 750.520d(1)(b) (sexual penetration using force or coercion), one count of fourth-degree criminal sexual conduct, Mich. Comp. Laws § 750.520e(1)(b)(sexual contact using force or coercion), and two counts of furnishing alcohol to a minor, Mich. Comp. Laws § 436.1701. The charges arose from allegations that Petitioner (1) furnished alcohol to two teenage brothers, (2) engaged in sexual penetration with the older

brother (W.B.), and (3) inappropriately touched the younger brother (T.B.).[1]  Petitioner was forty-one or forty-two years old at the time, and the brothers were sixteen or seventeen years old.

W.B. testified that he worked for Petitioner on his property and often spent the night there on weekends.  On March 10, 2001, Petitioner put his mouth on W.B.'s penis, and on August 2, 2002, Petitioner anally penetrated him.  The 2001 incident occurred in Petitioner's downstairs bedroom where Petitioner, W.B., T.B., and their cousin spent the night.  The 2002 incident occurred in Petitioner's attic bedroom where W.B., T.B., and Petitioner slept.  W.B. did not consent to having sexual intercourse with Petitioner, but Petitioner told him not to say anything to anybody because they were not hurting anybody but themselves.

W.B. eventually told his girlfriend what had happened, and his girlfriend encouraged him to tell his parents.  He disclosed the incidents to his mother and then to his father and requested a test for HIV.  Later, he and his family met with Petitioner and talked about what had happened.  Sometime after that meeting, Petitioner stopped W.B. on the street and said that, if W.B. did not drop the charges, he would tell W.B.'s parents that W.B. had become drunk, gone out, and prostituted himself.  W.B. denied having any reason for fabricating the charges against Petitioner.  He claimed that he had thought of Petitioner as a friend, and he admitted that he continued to go to Petitioner's home after the 2002 incident.

T.B. testified that he also worked for Petitioner, socialized with Petitioner, and considered him a friend.  During July and August of 2002, Petitioner furnished T.B. with

---

[1] For the sake of the alleged victims' privacy, the Court will refer to the brothers by their initials.

alcohol, and on one occasion, Petitioner touched T.B.'s penis over his clothes. T.B. told Petitioner to stop what he was doing, and he pushed Petitioner away from him. T.B. did not say anything about the incident to anyone because he was scared and embarrassed. He considered Petitioner to be a friend even after the incident, and he did not want to see Petitioner get into trouble. However, he told his parents what happened when they approached him one day and asked him some questions.

T.B. testified that he had no reason to fabricate his allegations, and he initially denied telling Petitioner at a county fair a few months before trial that he was sorry and that nothing happened. He further denied telling Petitioner that the reason for the allegations was his fear of his father. He continued to go over to Petitioner's house after the incident and he had hoped to keep the incident a secret. He would not have told anybody about it if his parents had not confronted him.

The boys' father testified that he knew Petitioner fairly well and considered him to be a friend at the time. After his wife brought something to his attention, he talked to his sons, who confirmed that what he had heard was true. He invited Petitioner to his home and confronted Petitioner with his sons' allegations while secretly taping the conversation. When he asked Petitioner whether he had molested his sons, Petitioner responded that he did not know or could not remember, but he did not think he did. Petitioner made it appear as though he had been drunk at the time and for that reason could not remember everything.

Detective Virgil Franks testified that he interviewed W.B. and T.B. and concluded that they were ashamed to talk about the allegations. He did not ask the boys to undergo any medical tests because the last sexual activity had occurred five or six months earlier and the chance of

any physical evidence still being available was unlikely.

Richard Hensley testified for the defense that Petitioner attended a Halloween party with W.B. and T.B. at Hensley's bowling alley in 2002 and that neither boy acted strangely around Petitioner. Ronald Perry testified that he helped Petitioner move some things out of his attic in November of 2002 so that he could put a bed and mattress in the attic. Prior to that date, Petitioner slept in an addition to his house. On cross-examination, Mr. Perry admitted that he did not know how the attic was arranged in August of 2002.

Petitioner's nephew, Benjamin Welsh, testified that he, W.B., and T.B. spent the night at Petitioner's house on March 10, 2001. He woke up several times that night, but did not recall seeing any sexual activity in the bedroom. Nor did he notice any change in W.B.'s and T.B.'s behavior toward Petitioner after that date. During the summer of 2002, Petitioner's attic bedroom was filled with boxes. However, he had no reason to believe that W.B. or T.B. would fabricate their allegations against Petitioner.

Petitioner's sister-in-law, Dawn Welsh, testified that in July of 2003 she was at the county fair with her son and Petitioner. They saw T.B. and T.B.'s friend Alex at the fair. Although a condition of Petitioner's bond was to avoid any contact with either W.B. or T.B., Petitioner asked T.B. some questions about the case and secretly taped the conversation. T.B. responded to Petitioner's and Dawn's questions by saying that the events never happened and that he was afraid of what his father would do to him. T.B. demonstrated no fear of Petitioner.

Petitioner testified that he had provided alcohol to T.B. and W.B., but he denied having any sexual contact with W.B., T.B., or any other boys. He denied having oral sex with W.B. in March of 2001, penetrating W.B. on another occasion, and grabbing T.B.'s private areas in July

4

of 2002. He also said that he did not sleep in the attic during the summer of 2002. He maintained that W.B. had falsely accused him because he criticized W.B. for doing things he should not have been doing and for informing W.B. that W.B.'s girlfriend was flirting with Petitioner and other people.

Petitioner admitted that he approached T.B. at the county fair and intentionally violated the conditions of bond. He claimed that he had been trying to prove his innocence. He also claimed that T.B. had denied being touched or grabbed inappropriately, that he knew the allegations against Petitioner were lies, and that he was afraid of being beat by his parents if he sided with Petitioner. Petitioner thought that T.B. made up the accusations against him or was coerced into going along with W.B.'s accusations.

Petitioner further admitted that, during his conversation with W.B., T.B., and their parents, T.B. had said that Petitioner grabbed him. He did not deny T.B.'s accusation at the time, and he admitted at trial that he probably asked T.B. whether he had tried to do anything else. If he apologized to the boys during that meeting with the family, he meant to apologize for what they were going through right then, not for any sexual activity.

Petitioner also conceded at trial that, after the boys made their accusations about him, he followed them on occasion and videotaped them. He was quite sure that this conduct made the boys feel uncomfortable and possibly intimidated. He thought that the boys were untruthful and were willing to perjure themselves out of fear of beatings at home.

T.B. was recalled to the witness stand and testified about his conversation with Petitioner and Dawn Welsh at the county fair in July of 2003. He explained that, when he was asked earlier in the trial whether he had told anyone that these things never happened, he had forgotten

5

about the incident at the county fair. He claimed that he had felt a little intimidated when Petitioner talked to him at the fair and that he had lied to Petitioner and Dawn Welsh. He told them what they wanted to hear so that they would leave him alone. He did not want to talk about the incident. For the same reason, he initially did not disclose the sexual incident with Petitioner.

W.B. testified on rebuttal that he did not get angry with Petitioner for talking to his girlfriend, that he had no reason to be angry, and that Petitioner's conversation with his girlfriend did not motivate him to make up the allegations about Petitioner. W.B. also denied being afraid of his father or fabricating the allegations as a result of fear of his father. T.B. likewise testified on rebuttal that he was not afraid of his father, that he never had an occasion to want to leave home, and that his father did not tell him or force him to press charges against Petitioner.

The defense theory was that the prosecution witnesses were not credible and that the prosecutor did not prove the criminal sexual conduct charges beyond a reasonable doubt. Defense counsel pointed out in closing arguments that W.B. had to be prompted by the prosecutor to testify about the fellatio on March 10, 2001, and that W.B. was contradicted by other witnesses, including T.B., when he testified that he, T.B., and Petitioner had slept in the attic on August 2, 2002. Defense counsel discredited T.B.'s testimony by pointing out that T.B. had accused Petitioner, then said that it did not happen, and later said that he lied about it not happening.

### B. The Verdict, Sentence, and Appeals

On October 8, 2003, a Van Buren County Circuit Court jury found Petitioner guilty, as charged, of two counts of third-degree criminal sexual conduct, one count of fourth-degree

6

criminal sexual conduct, and two counts of furnishing a minor with alcohol. The trial court sentenced Petitioner to imprisonment for forty-five months to fifteen years for each third-degree criminal sexual conduct conviction and to forty-two days in prison for the other convictions. Petitioner filed a motion for new trial, alleging ineffective assistance of counsel, but the trial court denied his motion after conducting an evidentiary hearing and finding no support for Petitioner's claim that his trial attorney was ineffective.

Petitioner raised his habeas claims in an appeal to the Michigan Court of Appeals, which affirmed his convictions. *See People v. Welsh*, No. 252561 (Mich. Ct. App. June 21, 2005). Petitioner raised the same claims in an application for leave to appeal in the Michigan Supreme Court. He also claimed to have newly discovered evidence that T.B. recanted his trial testimony. The Michigan Supreme Court remanded his case to the court of appeals to reconsider whether Petitioner's third-degree criminal sexual conduct convictions were supported by sufficient evidence in light of *People v. Carlson*, 466 Mich. 130, 140; 644 N.W.2d 704 (2002), and the statute. The state supreme court denied leave to appeal in all other respects, because it was not persuaded to review the other issues. *See People v. Welsh*, 474 Mich. 917; 705 N.W.2d 346 (2005).

On remand, the Michigan Court of Appeals distinguished the facts in *Carlson* from the facts in Petitioner's case and once again affirmed Petitioner's convictions. *See People v. Welsh*, No. 252561 (Mich. Ct. App. Jan. 17, 2006). The Michigan Supreme Court subsequently denied leave to appeal because it was not persuaded to review the issues. *See People v. Welsh*, 477 Mich. 882; 721 N.W.2d 796 (2006).[2]

---

[2] Justice Stephen J. Markman voted to grant leave to appeal.

### C. The Habeas Petition and Answer

Petitioner filed his habeas corpus petition on November 30, 2006. He claims that he was deprived of effective assistance of trial counsel and that the evidence was insufficient to sustain his criminal sexual conduct convictions. Respondent argues in an answer to the habeas petition that sufficient evidence supported Petitioner's convictions and that the state court's conclusion on Petitioner's ineffectiveness claims was not unreasonable.

## II. Standard of Review

Petitioner is entitled to the writ of habeas corpus only if the state court's adjudication of his claims on the merits–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (Justice O'Connor's majority opinion on Part II). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

8

## III. Discussion

### A. Trial Counsel

Petitioner alleges that his trial attorney deprived him of his constitutional right to effective assistance of counsel. Specifically, Petitioner alleges that defense counsel failed to hire a private investigator or medical expert, failed to admit in evidence an audiotape in which T.B. stated that Petitioner did not touch him inappropriately, failed to interview and call available witnesses, and failed to contradict the prosecution's witnesses.

#### 1. *Strickland v. Washington*

The Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), "qualifies as 'clearly established Federal law'" for purposes of evaluating ineffective-assistance-of-counsel claims. *Williams*, 529 U.S. at 391. Pursuant to *Strickland*, the petitioner must demonstrate that his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. The petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688.

To demonstrate that counsel's performance prejudiced the defense, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

> Defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. While "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *Id.* at 690, 104 S.Ct. 2052, decisions made by counsel after less thorough investigations "are

9

reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 691, 104 S.Ct. 2052. In determining what is objectively unreasonable, [courts] "conduct an objective review of [counsel's] performance, measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins* [*v. Smith,* 539 U.S. 510, 523, 123 S. Ct. 2527 (2003)] (quoting *Strickland,* 466 U.S. at 688-89, 104 S.Ct. 2052) (internal citations omitted).

*Poindexter v. Booker*, 301 Fed. Appx. 522, 527 (6th Cir. 2008).

### 2. Medical Expert and Private Investigator

Petitioner alleges that his attorney advised him of the need for a private investigator and a medical expert, but failed to hire either person and waited too long to seek an adjournment of the trial. The Court finds that the failure to hire a medical expert was reasonable trial strategy because there were no medical records to review. Neither W.B. nor T.B. was examined by a doctor after the incidents in question.

The failure to hire a private investigator before trial is a closer question. Petitioner's trial attorney testified at the post-conviction hearing on July 9, 2004, that he made no attempt to have an investigator appointed and that the financial aspects of hiring a private investigator were not settled until shortly before trial. After trial, Petitioner's family hired a private investigator, who interviewed T.B. The investigator elicited admissions from T.B. that he had made false statements to the police during the initial investigation of this case because he was afraid that his father would punish him. T.B. expressed remorse for making false statements to the police and for causing Petitioner to go to prison. He claimed that he lied to his father because he knew his father would not believe him if he stated that Petitioner never touched him, and he feared his father because his father had beaten him in the past.

Had defense counsel hired a private investigator before trial, the investigator might have

been able to elicit the same admissions from T.B. However, the jury was made aware that, before trial, T.B. confirmed with Petitioner at the county fair that nothing happened and that Petitioner never touched him inappropriately. T.B. explained to the jury that he made those remarks to Petitioner because he was uncomfortable talking about the issue and because he had wanted to get away from Petitioner and his sister-in-law, who had confronted him and asked him questions. He told Petitioner and his sister-in-law what they wanted to hear in order to terminate the conversation. The jury apparently believed T.B.'s trial testimony and accepted his explanation for the lies that he told Petitioner and his sister-in-law.

The Court concludes that even if counsel failed to make a reasonable investigation or a reasonable decision that made hiring an investigator unnecessary, Petitioner cannot establish that this deficient performance prejudiced the outcome of the proceedings. The evidence against Petitioner was substantial. W.B., who was the older and more talkative brother, did not recant his accusations, and he denied having any motive for fabricating his allegations. Petitioner did not claim to be innocent when the family confronted him with W.B.'s and T.B.'s accusations. Instead, he claimed that he did not know or remember whether he had sexually molested the boys, and he asked T.B. whether he had done anything more than touch him in a sexual manner. He conceded at trial that T.B. may have responded, "No, but you tried." (Tr. Oct. 8, 2003, at 104-05.)

Defense counsel's failure to hire an investigator before trial in all probability did not prejudice the defense. Therefore, defense counsel was not ineffective.

### 3. Failure to Admit the Audiotape of the Conversation at the County Fair

Petitioner alleges next that his attorney should have admitted in evidence the audiotape of his conversation with T.B. at the county fair. T.B. stated during that conversation that Petitioner did not touch him inappropriately.

Defense counsel attempted to admit the audiotape, but he withdrew his motion after T.B. was called to the stand and testified that he had lied when he told Petitioner that there had been no inappropriate touching. (Tr. Oct. 8, 2003, at 134, 144.) The trial court stated in its order denying Petitioner's motion for a new trial that the court would not have allowed the tape to be admitted in evidence even if defense counsel had continued to offer it. The court noted that the tape was hearsay and was consistent with T.B.'s testimony after T.B. admitted what he had said to Petitioner at the fair.

Additionally, the trial court held that the tape was not of a good quality due to background noise, and the transcript of the tape recording suggests that Petitioner was pressuring T.B. to retract his accusations. Petitioner states at one point during the taped conversation that his boss had called him and that he did not know what was going on, but he was waiting "in hopes that you guys would make the first move." *See* Dkt. No. 17-2 at 41. He goes on to say that it was unfortunate that he had to put pressure on the two of them, but he was hoping T.B. could be a friend. *Id*. In the trial court's words, Petitioner "was being very assertive with this teenager he [was] accused of violating. It does not impress one as a good thing for the fact-finder to hear, from the Defendant's standpoint." *People v. Welsh*, No. 08-13348-FH, at 3 (Van Buren County Cir. Ct. Sept. 10, 2004.) This Court agrees with the trial court that defense counsel was not ineffective for failing to admit the audiotape of the conversation between Petitioner and T.B. at the county fair. Even if counsel's performance was deficient in not

admitting the tape itself, the deficient performance did not prejudice Petitioner because the favorable content of the conversation was brought out through testimony.

### 4. Failure to Investigate and Produce Witnesses

Petitioner alleges that his attorney should have investigated his case before trial and produced witnesses who were available to testify at trial. Petitioner has not said what evidence or witnesses his attorney should have investigated or produced at trial. At the post-conviction hearing, he claimed that his trial attorney should have investigated and produced (1) his work records to show that he worked during the week when he allegedly touched T.B. and that the boys did not stay overnight at his house during the work week, (2) pictures showing him with the boys after the incidents in question, (3) witnesses who would have testified that W.B. and T.B. were not afraid of him and continued to have contact with him after the alleged sexual incidents, (4) evidence that W.B. had taken karate lessons and should have been able to resist Petitioner, (5) evidence that W.B. performed well in school after the sexual encounters, and (6) telephone records and a written document indicating that T.B. tried to contact Petitioner and to help him.

Petitioner's work records were irrelevant, because the testimony at trial, including his own testimony, established that W.B. and T.B. stayed overnight at his home on weekends. There was testimony that the incidents with W.B. occurred at night, not during working hours, and T.B. did not say what time of day the incident with him occurred. Photos and witnesses demonstrating that W.B. and T.B. were not afraid of Petitioner and continued to spend time with him after the alleged sexual incidents would have been cumulative evidence, as they admitted that at trial.

13

The fact that W.B. was taking karate lessons would not have benefitted Petitioner, because W.B. testified that, during the anal penetration, Petitioner pinned him down, and he could not move. The fact that W.B. did well in school, despite the traumatic incidents, is not proof of Petitioner's innocence. W.B. claimed that he simply became more cautious about his friends and the people with whom he spent time. As for the telephone records and written document, the trial court described the handwritten document as illegible, and T.B. testified that he did not call Petitioner or try to help him, but that his friends may have called Petitioner.

None of the omitted evidence would have helped Petitioner, as it had little or no probative value. Therefore, defense counsel was not ineffective in failing to investigate or produce the evidence.

### 5. Failure to Object to Evidence and Contradict Prosecution Witnesses

Petitioner alleges that his attorney failed to object to evidence and failed to effectively contradict prosecution witnesses. The record indicates that defense counsel thoroughly cross-examined prosecution witnesses and presented several defense witnesses. Although defense counsel did not object to the admission of the taped recording of the conversation at the victims' home, Petitioner has not suggested a basis for objecting to the recording. And, even if the tape were hearsay, some portions of the taped conversation were brought out during the testimony at trial, including Petitioner's testimony.

Petitioner has failed to show that his attorney's performance was deficient and that the deficient performance "result[ed] in an unreliable or fundamentally unfair outcome." *Miller v. Francis,* 269 F.3d 609, 615 (6th Cir. 2001) (citing *Strickland,* 466 U.S. at 692). There is not a reasonable probability that, but for counsel's acts and omissions, the result of the trial would

14

have been different. Accordingly, Petitioner is not entitled to relief on the basis of his first claim.

### B. Sufficiency of the Evidence

Petitioner's second and final claim alleges that the prosecution failed to prove the elements of criminal sexual conduct. Petitioner contends that there was no evidence of force, coercion, or threats and no indication that he was related to the victims or used a position of authority to accomplish criminal sexual conduct. Petitioner also contends that W.B.'s statements to the police were riddled with inconsistencies and that T.B. recanted his accusations.

#### 1. *Jackson v. Virginia*

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The critical question on review of the sufficiency of the evidence to support a criminal conviction is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). This "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id*. at 324 n.16.

In Michigan, a person is guilty of criminal sexual conduct in the third degree if the person engages in sexual penetration with another person and force or coercion is used to accomplish the sexual penetration. Mich. Comp. Laws § 750.520d(1)(b). "[T]he prohibited 'force' encompasses the use of force against a victim to either induce the victim to submit to sexual penetration or to seize control of the victim in a manner to facilitate the accomplishment

15

of sexual penetration without regard to the victim's wishes." *People v. Carlson*, 466 Mich. 130, 140; 644 N.W.2d 704, 709 (2002).

A person is guilty of fourth-degree criminal sexual conduct if he or she engages in sexual contact with another person and "[f]orce or coercion is used to accomplish the sexual contact." Mich. Comp. Laws § 750.520e(1)(b). "Force or coercion," for purposes of the criminal sexual conduct statutes,

> is to be determined in light of all the circumstances and is not limited to acts of physical violence. *People v. Malkowski*, 198 Mich. App. 610, 613; 499 N.W.2d 450 (1993). Coercion
>
>> may be actual, direct, or positive, as where physical force is used to compel [one to] act against one's will, or implied, legal or constructive, as where one is constrained by subjugation . . . to do what his free will would refuse.

*People v. Premo*, 213 Mich. App. 406, 410-411; 540 N.W.2d 715, 717 (1995) (quoting Black's Law Dictionary (5th ed.), 234) (alterations added).

### 2. W.B. and the March 2001 Incident

W.B. testified that, on March 10, 2001, the petitioner furnished him with alcohol and took him to a rock concert. He was sixteen years old at the time. After the concert, they went back to Petitioner's home, where he spent the night. Petitioner woke him up by fondling his penis. Petitioner also put his mouth on W.B.'s penis. W.B. did not say anything, because he was too embarrassed.

The Michigan Court of Appeals stated that there was enough evidence to support the conviction for third-degree criminal sexual conduct because Petitioner abused his position of authority and trust. This conclusion is supported by the record. Petitioner was a family friend,

who was more than twenty years older than his victims. W.B. and T.B. did odd jobs for Petitioner and also socialized with him. They and their father considered Petitioner to be a friend and trustworthy. Petitioner himself testified that he considered himself to be an uncle to W.B. and T.B. and that they sometimes called him "Uncle Mike." He paid the boys with money and gifts for working on his property. W.B. and T.B. trusted Petitioner and had a close relationship with him.

Petitioner's sexual conduct constituted implied, legal, or constructive coercion, because he abused his status as an employer, family acquaintance, and older friend. As a person in authority, his conduct was sufficient to constitute coercion for purposes of Mich. Comp. Laws § 750.520d(1)(b). *Premo*, 213 Mich. App. at 411; 540 N.W.2d at 717.

### 3. W.B. and the August 2002 Incident

W.B. testified that he spent a night at Petitioner's home in August of 2002. He woke up to find Petitioner on top of him. Petitioner pulled off W.B.'s clothes and placed his penis in W.B.'s anus. W.B. did not say anything to Petitioner because he was frightened, embarrassed, and ashamed. He tried to get away, but he was pinned down and could not move. W.B.'s testimony that Petitioner pinned him down was sufficient to demonstrate that Petitioner used "force or coercion" to accomplish sexual penetration.

### 4. T.B. and the July 8, 2002 Incident

T.B. testified that, on July 8, 2002, Petitioner touched his penis over his clothes. He told Petitioner to stop, and it took some effort to push Petitioner away from him. This testimony was sufficient to show that Petitioner used "force or coercion" to accomplish an unwanted touching.

### 5. Conclusion

17

A rational trier of fact could have concluded from the evidence, taken in the light most favorable to the prosecution, that Petitioner accomplished sexual penetration and sexual contact through the use of force or coercion. He seized control of his victims to facilitate sexual penetration and a sexual touching without regard to the victims' wishes, and he constructively coerced the victims through an abuse of his authority as an older person, as their employer, and as their father's friend. Therefore, the state appellate court's conclusion that the evidence was sufficient to support Petitioner's criminal sexual conduct convictions was not contrary to, or an unreasonable application of, *Jackson*.

Although Petitioner implies that W.B. and T.B. were not credible witnesses, "under *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995). "It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) (citing *Neal v. Morris,* 972 F.2d 675, 679 (6th Cir. 1992)). "[A]ttacks on witness credibility are simply challenges to the *quality* of the government's evidence and not to the sufficient of the evidence." *United States v. Adamo*, 742 F.2d 927, 935 (6th Cir. 1984) (emphasis in original).

## IV. Conclusion

The state court's conclusions did not result in unreasonable determinations of the facts and were not contrary to, or an unreasonable application of, Supreme Court precedent. Accordingly, the habeas petition is **DENIED**. Petitioner may appeal this Court's decision on both issues because reasonable jurists could find the Court's assessment of the constitutional claims debatable. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may proceed *in*

*forma pauperis* on appeal because an appeal would not be frivolous and could be taken in good faith. 28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(4)(B).

          S/Denise Page Hood  
          Denise Page Hood  
          United States District Judge

Dated: March 12, 2010

     I hereby certify that a copy of the foregoing document was served upon Michael F. Welsh, Reg. No. 474199, Mid-Michigan Correctional Facility, 8201 N. Croswell Rd., St. Louis, MI 48880 and counsel of record on March 12, 2010, by electronic and/or ordinary mail.

          S/William F. Lewis  
          Case Manager